UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BISRAT MESFIN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>GOITOM NEGA GEBREHIWOT, *et al.*,<br><br>　　　　Defendants. | Case No. 23-cv-1215-MJS |

**MEMORANDUM OPINION**

　　This case springs from a series of currency-exchange transactions gone wrong. According to Plaintiff Bisrat Mesfin, he lost the equivalent of hundreds of thousands of U.S. dollars when he engaged Goitom Nega Gebrehiwot and Mr. Gebrehiwot's business, Et Raiye, LLC, to exchange significant sums of Ethiopian birr. Following a few successful smaller-value transactions, Mesfin initiated several larger transfers with Gebrehiwot and Et Raiye collectively worth almost $375,000 in U.S. dollars. But after Mesfin sent those larger amounts in Ethiopian birr, Gebrehiwot and Et Raiye never repaid Mesfin in U.S. dollars. Mesfin did not receive any return funds at all. So Mesfin sued. He now brings claims for breach of contract, fraud, and other common-law and statutory claims. Before the Court is a motion for partial dismissal filed by Gebrehiwot and Et Raiye. (ECF No. 56.) For the reasons that follow, the motion is functionally moot as to Et Raiye—Et Raiye defaulted after failing to retain new legal counsel to represent it in the case—but the Court **GRANTS IN PART** and **DENIES IN PART** the motion as to Gebrehiwot, dismissing Mesfin's claim under the Racketeer Influenced and Corrupt Organizations ("RICO") Act but no others.

**FACTUAL BACKGROUND**

The Court derives the following facts, accepted as true for these purposes, from the operative complaint. *Joyner v. Morrison & Foerster, LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025).

After immigrating to the United States from Ethiopia, Plaintiff Bisrat Mesfin sold his home in Ethiopia's capital, Addis Ababa, in 2022. (Am. Compl. ¶ 6.) The proceeds of that sale yielded approximately 19 million in Ethiopian birr, which Mesfin wished to exchange for U.S. dollars in the United States. (*Id.*) After asking for recommendations within the local Ethiopian community, Mesfin discovered Et Raiye, a Maryland-licensed money transmitter. (*Id.* ¶¶ 7–10.)

On November 20, 2022, Mesfin went to Et Raiye's office in Silver Spring, Maryland—located in a small shopping center on Eastern Avenue—for a prearranged meeting with Et Raiye's operator, Mr. Gebrehiwot. (*Id.* ¶¶ 8–9.) Mesfin said that he was looking to convert 19 million Ethiopian birr to U.S. dollars, and Gebrehiwot explained that "because the exchange involved a large amount of money, it would have to be done in multiple transactions." (*Id.* ¶ 9.) During the meeting, Gebrehiwot touted his experience and reputation, including by stating that he was "legitimate and licensed," by opening a safe in front of Mesfin to display "an enormous quantity of cash he kept on hand for such transactions," and by representing that he was "highly trusted in the community and held a prominent position in a local Ethiopian church, where he served the Ethiopian congregation." (*Id.*) Gebrehiwot proposed an exchange rate of 1-to-56 (one U.S. dollar for every fifty-six Ethiopian birr), with the exchange to be completed across multiple transactions whereby Mesfin would send payments in Ethiopian birr to bank accounts in Ethiopia that Gebrehiwot controlled, and Gebrehiwot would then pay Mesfin directly in U.S. dollars. (*Id.*)

Mesfin left the meeting without committing to any arrangement, but he continued to investigate Et Raiye, including by visiting its website, as Gebrehiwot had suggested. (Am. Compl.

2

¶ 10.) According to Mesfin, Gebrehiwot's pitch—including his display of the "large amount of cash" and his "position in the Ethiopian church"—was convincing. (*See id.*) So, when Gebrehiwot messaged Mesfin a few days later via WhatsApp to confirm whether he wanted to do business with Et Raiye and "make his first deposit," Mesfin agreed to move forward. (*Id.* ¶ 11.)

At that point, Gebrehiwot sent Mesfin details for an Ethiopian bank account to which Mesfin was to transfer a specific amount of Ethiopian birr to initiate the exchange. (Am. Compl. ¶ 11.) After Mesfin did so, he went to Et Raiye's office, where Gebrehiwot handed him a corresponding cash payment in U.S. dollars. (*Id.*) This process played out several more times, with Mesfin transferring specific amounts of Ethiopian birr to bank accounts in Ethiopia specified by Gebrehiwot and then receiving the agreed exchange payments in U.S. dollars—either in cash that Gebrehiwot handed to Mesfin, or via a Zelle payment from Gebrehiwot to Mesfin—until Mesfin received $59,000 in U.S. dollars through various transfers with Gebrehiwot and Et Raiye. (*Id.*)

Then, over the course of about three weeks in November and December 2022, Mesfin transferred considerably larger amounts based on similar instructions from Gebrehiwot—who specified via WhatsApp messages the transfer amounts and the designated bank accounts in Ethiopia. (Am. Compl. ¶ 12.) Those amounts ranged from about 65,000 birr (valued at approximately $1,150) to 5 million birr (valued at approximately $90,000) and spanned eight separate transfers between November 29 and December 17, 2022. (*Id.*) Collectively, the transfers totaled nearly 21 million Ethiopian birr (valued at more than $373,000). (*Id.*)

But after Mesfin transferred those amounts to the Ethiopian bank accounts as directed by Gebrehiwot, Gebrehiwot and Et Raiye never paid Mesfin the corresponding amounts in U.S. dollars. (Am. Compl. ¶ 13.) Mesfin did not receive any funds back in exchange. When Mesfin tried to get information from Gebrehiwot and Et Raiye, Gebrehiwot messaged him via WhatsApp

3

and claimed he was "talking to third parties and would soon have his money." (*Id.* ¶ 14.) Gebrehiwot "even went so far as to offer Mr. Mesfin a car as partial payment," which Mesfin refused. (*Id.*) But as of the filing of the Amended Complaint (and seemingly through today), Mesfin has not received any money in return for the completed transfers described above. (*Id.*)

## PROCEDURAL HISTORY

Mesfin filed suit in May 2023. The case has moved in fits and starts ever since.

Originally, both Gebrehiwot and Et Raiye failed to appear in the case, so the Clerk entered default against them in June 2023. (ECF No. 6.) But then Gebrehiwot filed an answer in August 2023 (ECF No. 8), and the Court—at that point, Judge Amy Berman Jackson—stayed the case and referred it to mediation (ECF No. 12). The Court appointed defense counsel for the limited purpose of mediation (ECF Nos. 16, 17), which took place in May 2024, with no settlement reached (Min. Entry, May 16, 2025). Afterward, the Court lifted the stay and vacated default as to Gebrehiwot. (Min Order, Oct. 4, 2024). Plaintiff later moved for default judgment against Et Raiye (ECF Nos. 21, 22), and the Court—by that time, Judge Amir Ali, after reassignment—ordered Et Raiye to show cause why the motion should not be granted. (Min. Order, Mar. 25, 2025.)

In April 2025, retained counsel made an appearance on behalf of both Gebrehiwot and Et Raiye. (ECF Nos. 39, 40.) All parties then consented to proceed before a U.S. Magistrate Judge for all purposes, and the case was reassigned to the undersigned in May 2025. (Min. Order, May 1, 2025.) The Court held a hearing soon after, during which it vacated the default against Et Raiye and granted Mesfin leave to file an amended complaint, among other rulings. (ECF No. 48.)

Mesfin filed his Amended Complaint—now the operative complaint—in June 2025 (ECF No. 55 ("Am. Compl.").). It asserts eleven claims for relief: breach of contract against Et Raiye and against Gebrehiwot, through separate counts (Counts I and II); fraud against both defendants

4

(Count III); violation of RICO against both defendants (Count IV); violation of the Maryland Consumer Protection Act ("MCPA") against both defendants (Count V); breach of fiduciary duty against Et Raiye (Count VI); negligence against both defendants (Count VII); unjust enrichment against Gebrehiwot (Count VIII); conversion against both defendants (Count IX); promissory estoppel against Et Raiye (Count X); and a claim for vicarious liability that seeks to hold Gebrehiwot individually liable for Et Raiye's actions (Count XI). (*See id.* ¶¶ 17–69.)

Through counsel, Defendants—both Gebrehiwot and Et Raiye—filed a motion for partial dismissal, seeking to dismiss Counts III through IX. (ECF No. 56 ("Mot.").) In other words, Defendants sought dismissal of all but the breach of contract, promissory estoppel, and vicarious liability claims (Counts I–II and Counts X–XI). Mesfin timely opposed. (ECF No. 63 ("Opp'n").). Defendants opted not to file any reply, so the Court considers the matter fully briefed.

In late June 2025, defense counsel moved to withdraw from representing both Gebrehiwot and Et Raiye, citing "irreconcilable differences." (ECF No. 60.) The Court convened a status hearing on July 22, 2025, during which it explained that it expected to grant withdrawal, but it stayed the case for forty-five (45) days to allow Et Raiye to find new counsel first. The Court issued a written order to explain its approach and to explicitly warn Et Raiye about the consequences of failing to secure counsel—namely, the prospect of default. (ECF No. 64.) At the conclusion of the stay, Gebrehiwot appeared at a status conference but no new counsel had entered an appearance for Et Raiye. The Court granted Et Raiye more time, including after a confusing set of filings the following week, which the Court summarized in an earlier ruling. (*See* ECF No. 71.) After these myriad opportunities for new counsel to enter an appearance on Et Raiye's behalf came and went, the Court ultimately directed the Clerk to enter default against Et Raiye. (Min. Order, Sept. 17, 2025.) Accordingly, Et Raiye is now officially in default. (ECF No. 73.)

**LEGAL STANDARDS**

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acial plausibility" means the complaint's facts must allow for a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In carrying out this analysis, the Court construes the complaint "in favor of the plaintiff" and affords the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). That said, the Court need not accept as true "legal conclusions couched as factual allegations." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016). Further, mere "recitals of the [legal] elements of a cause of action" cannot "suffice" to forestall a motion to dismiss. *L. Xia v. Tillerson*, 865 F.3d 643, 650 (D.C. Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

**ANALYSIS**

As previewed, Gebrehiwot seeks to dismiss most—but not all—of the claims that Mesfin pursues through the Amended Complaint. Before engaging with the specific arguments on the various claims at issue, the Court pauses to address two overarching points.

**I.   Threshold Matters**

First, the Court's analysis here focuses strictly on the motion's arguments for dismissal as to Gebrehiwot—not Et Raiye—because Et Raiye has defaulted. After multiple chances and multiple warnings from the Court, Et Raiye never engaged new legal counsel to appear on its behalf in the wake of its prior counsel's withdrawal. As forewarned, Et Raiye "may appear in the federal courts only through licensed counsel" (ECF No. 64 at 3 (quoting *Greater Southeast Cmty.*

6

*Hosp. Found., Inc. v. Potter*, 586 F.3d 1, 4 (D.C. Cir. 2009))), meaning that without an attorney to represent it, Et Raiye "risk[ed] being found in default" (*id.*). After that warning, the Court granted Et Raiye's prior counsel's motion to withdraw (Min. Order, Sept. 5, 2025), and Et Raiye did not arrange for new counsel to enter an appearance in the case—something the Court had been cautioning against for months. Accordingly, the Court ordered (Min. Order, Sept. 17, 2025) that Et Raiye be found in default. *See, e.g.*, *Motir Servs. v. Ekwuno*, 191 F. Supp. 3d 98, 106–07 (D.D.C. 2016) (entering default against business defendant in similar circumstances). Because Et Raiye is officially in default at this juncture (ECF No. 73), its joinder in the motion to dismiss is functionally extinguished, so the Court's ruling addresses only Gebrehiwot's arguments for dismissal.

Second, both sides seem to assume that Maryland law governs their non-statutory claims, without engaging in any sort of choice-of-law analysis themselves.[1] In diversity cases, a federal court applies the choice-of-law rules of the jurisdiction where it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). For torts, the District of Columbia applies the "law of the jurisdiction that has the most significant relationship to the dispute." *Abbas v. Foreign Policy Grp., LLC (Abbas II)*, 783 F.3d 1328, 1338 n.6 (D.C. Cir. 2015). To determine the most significant relationship, courts consider factors such as "the jurisdiction 'where the injury occurred, where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties[.]'" *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 272 n.10 (D.D.C. 2017) (quoting *Abbas II*, 783 F.3d at 1338 n.6). Here, even though Gebrehiwot is a citizen of the District of Columbia, Maryland appears to have a more considerable relationship to this dispute than D.C., including because Mesfin alleges that: he is a Maryland resident (Am. Compl. ¶ 1); the relevant meetings happened at Et Raiye's Maryland-based office (*id.* ¶¶ 8, 11);

---

[1] The parties largely cite Maryland law in support of their arguments (*see, e.g.*, Mot. at 8; Opp'n at 2), but they occasionally reference District of Columbia law (*see* Mot. at 2; Opp'n at 7).

and Et Raiye is a Maryland-licensed business. (*id.* ¶ 10). Accordingly, the Court follows the parties' general lead on this point and applies Maryland law where applicable.[2]

With those points in mind, the Court turns to the specific claims at issue.

## II.     Fraud (Count III)

Through Count III, Mesfin alleges that both Gebrehiwot and Et Raiye are liable for fraud in connection with the challenged currency transfers. (Am. Compl. ¶¶ 23–30.) Embedded within Mesfin's overall "fraud" claim is a theory of "constructive fraud." Though not separately pled, both sides briefed that theory separately, so the Court likewise addresses it separately.

### A.     Fraud Pleading Under Fed. R. Civ. P. 9(b)

To establish a claim of civil fraud under Maryland law, a plaintiff must show that: "(1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation." *Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005). In pressing for dismissal, Gebrehiwot does not directly challenge the sufficiency of Mesfin's allegations as to any of these discrete elements, however. Instead, Gebrehiwot argues—in more general terms—that the Amended Complaint fails to satisfy the heightened pleading requirements applicable to fraud claims under Federal Rule of Civil Procedure 9(b). The Court disagrees.

Rule 9(b) does impose a heightened pleading requirement for claims alleging fraud, such that a plaintiff must "state with particularity the circumstances constituting fraud or mistake." FED.

---

[2] In any case, the Court does not discern any material difference in Maryland law versus District of Columbia law that would lead to a different outcome or ruling on any of the arguments pressed here. To the extent one side or the other may disagree, they are free to ask the Court to revisit its choice-of-law approach—through an appropriately briefed and legally supported submission—later in the case.

R. CIV. P. 9(b). But Rule 9 must "be read in conjunction with Rule 8's command that a complaint need only include a 'short and plain statement' of the claim." *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 107 (D.D.C. 2013) (citing *United States ex rel. Williams v. Martin–Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)). "Read together, Rules 8 and 9(b) require that the pleader state the time, place, and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud, as well as the individuals allegedly involved in the fraud." *Id.*; *see also Bowers v. Legum & Norman Realty, Inc.*, 776 F. Supp. 3d 294, 304 (D. Md. 2025) (explaining that Rule 9(b) requires a plaintiff to "plead the 'who, what, when, where, and how of the alleged fraud'") (quoting *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)). These requirements ensure that "defendants have adequate notice of the charges against them to prepare a defense." *McWilliams Ballard, Inc. v. Level 2 Dev.*, 697 F. Supp. 2d 101, 108 (D.D.C. 2010).

Contrary to Gebrehiwot's position, Mesfin satisfies these requirements here. As to time and place, Mesfin alleges that Gebrehiwot—representing Et Raiye—made the foundational false statements on November 20, 2022, at Et Raiye's offices in Silver Spring, Maryland. (Am. Compl. ¶¶ 7–8.) And the Amended Complaint goes on to specify the various dates on which Gebrehiwot—representing Et Raiye—allegedly gave Mesfin fraudulent instructions to initiate additional currency exchanges via WhatsApp messages. (*Id.* ¶ 12.) As to the contents of the purported misrepresentations, Mesfin alleges that Gebrehiwot—representing Et Raiye—falsely told Mesfin that he would receive one U.S. dollar for every 56 birr he transferred pursuant to Gebrehiwot's instructions, which did not happen for the latter group of transfers. (*Id.* ¶¶ 9, 12, 24.) Further, Mesfin alleges that Gebrehiwot falsely represented that he (and by implication, Et Raiye) had control over the various Ethiopian accounts to which he directed Mesfin to transfer the funds. (*See*

9

*id.*) As to what was "given up as a consequence of the fraud," the Amended Complaint includes a detailed table specifying the dates of the challenged transactions, the amounts transferred, and more—showing that Mesfin allegedly lost the equivalent of hundreds of thousands of U.S. dollars. (*Id.* ¶ 12.) And finally, as to the individuals involved, the Amended Complaint directly and unmistakably points to Gebrehiwot—representing Et Raiye—as the source of the alleged misrepresentations. (*See id.* ¶¶ 9, 12, 24.) These particularized allegations amply demonstrate the "who, what, when, where, and how of the alleged fraud," *Bowers,* 776 F. Supp. 3d at 304, which means the Amended Complaint contains the specificity required by Rule 9(b).[3]

### B. Constructive Fraud

Turning to Mesfin's alternative fraud theory, Maryland law recognizes "constructive fraud" as a cause of action. It requires "proof that the defendant breached a legal or equitable duty by deception or by violating a confidence." *Chassels v. Krepps*, 174 A.3d 896, 904 (Md. App. 2017) (citing *Thompson v. UBS Fin. Servs., Inc.*, 115 A.3d 125, 138–39 (Md. 2015)). The predicate duty to support such a claim "generally arises in a context of trust or confidence, such as a fiduciary duty or confidential relationship." *Id.* Unlike a typical fraud claim, a claim based on constructive fraud does not require that "the culpable party had a dishonest purpose or intent to deceive." *Id.* The key "prerequisite" to this claim is a "confidential relationship"—*i.e.*, one "in which 'dominion or influence is exercised by one person over the other.'" *Id.* at 905 (quoting *Midler v. Shapiro*, 364 A.2d 99, 103 (Md. App. 1976)). In other words, "[c]ourts look at whether one party must

---

[3] Gebrehiwot also suggests that Mesfin does not sufficiently separate out the alleged fraud committed by each defendant, *i.e.*, Gebrehiwot and Et Raiye. (Mot. at 2.) As support, he cites *Antoine v. U.S. National Bank Ass'n*, 547 F. Supp. 2d 30 (D.D.C. 2008). But that case is inapposite. It involved multiple individual actors employed by a business defendant, and the court found that the complaint did not sufficiently allege the specific involvement of one of those individual actors (as compared to the other individuals). *See id.* at 37–39. But here, of course, there is only one individual actor involved—Gebrehiwot—and Gebrehiwot is alleged to be the operator and owner-member of Et Raiye. In other words, the Amended Complaint alleges that Gebrehiwot's actions are tantamount to Et Raiye's actions and vice versa. This suffices.

'necessarily repose trust and confidence in the good faith and integrity of the other, and whether a level of trust and confidence exists between two people." *Id.* (citations and quotations omitted).

Through the Amended Complaint, Mesfin grounds his "constructive fraud" claim in two places: the Maryland Money Transmission Act ("MMTA"), MD. CODE ANN., FIN. INST. § 12-414, and the federal Lanham Act, 15 U.S.C. § 1125(a) (imposing civil liability for the "false or misleading" descriptions of fact in connection with a federal trademark). (Am. Compl. ¶¶ 25–26.) Gebrehiwot's motion focuses exclusively on the second theory, insisting that federal trademark law cannot form the predicate for a constructive fraud claim under Maryland law. (Mot. at 3–4.) In response, Mesfin concedes as much, but he says the MMTA still does the trick because its provisions are reflective of the type of "confidential relationship" necessary for this sort of claim. (Opp'n at 7). Gebrehiwot is silent on that proposition. At this early stage of the case, then, the Court accepts Mesfin's "confidential relationship" allegations as sufficiently pled and declines to dismiss the constructive fraud claim on the basis urged by Gebrehiwot.

### III.   RICO (Count IV)

Through Count IV, Mesfin alleges that Gebrehiwot and Et Raiye (possibly acting with others) violated the federal RICO statute, 18 U.S.C. § 1962(c). (Am. Compl. ¶ 31–39.) Although Congress enacted RICO to pursue "the eradication of organized crime in the United States," the statute's "reach is not limited to mobsters and organized criminals" but also "extends to respected businesses allegedly engaged in a pattern of specifically identified criminal conduct." *Adler v. Loyd*, 496 F. Supp. 3d 269, 278 (D.D.C. 2020) (citations and quotations omitted).

To establish a successful RICO claim, a plaintiff must show "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Id.* (quoting *Salinas v. United States*, 522 U.S. 52, 62 (1997)). "A 'pattern of racketeering activity' is defined as 'at least two acts' that violate

state and federal laws enumerated in the RICO statute." *Id.* (quoting 18 U.S.C. § 1961(1), (5)). Here, Mesfin relies on two predicate criminal violations to argue for a "pattern of racketeering activity": 18 U.S.C. § 1960 (relating to illegal money transmitters) and 18 U.S.C. § 1343 (relating to wire fraud). (Am. Compl. ¶ 33.) According to Mesfin, Gebrehiwot and Et Raiye violated these statutes each time they secured Mesfin's participation in a money-exchange transaction and failed to complete it. These allegations, accepted as true, plausibly point to numerous predicate criminal acts. But the question remains whether they constitute a *pattern* of racketeering activity.

Relevant to this issue, the D.C. Circuit has cautioned that RICO claims premised on fraud "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *W. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 637 (D.C. Cir. 2001) ("This caution stems from the fact that it will be the unusual fraud that does not enlist the mails and wires in its service at least twice.") (citations and quotations omitted). To this end, "RICO's 'pattern' element prevents ordinary business disputes from becoming viable RICO claims," by requiring that "the predicate acts must be both related and continuous." *Adler*, 496 F. Supp. 3d at 279 (citations and quotations omitted); *see also Bridges v. Lezell Law, PC*, 842 F. Supp. 2d 261, 265 (D.D.C. 2012) (similar). Relatedness requires that "the predicate acts 'have the same or similar purposes, results, participants, victims, or methods of commission.'" *Lu v. Lezell*, 45 F. Supp. 3d 86, 97 (D.D.C. 2014) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)). As for continuity, the caselaw recognizes that it can be either "closed-ended" or "open-ended," meaning either "a closed period of repeated conduct, or … past conduct that by its nature projects into the future with a threat of repetition." *Adler*, 496 F. Supp. 3d at 279 (quoting *H.J. Inc.*, 492 U.S. at 241).

Gebrehiwot challenges Mesfin's RICO claim on the basis that he fails to plausibly allege the necessary continuity.[4] He says the Amended Complaint fails to put forward any non-conclusory allegations of open-ended continuity, and he argues that the Amended Complaint's allegations fail to allege sufficient closed-ended continuity because they are far too limited in scope. (Mot. at 5–6.) In response, Mesfin fails to engage on the issue of open-ended continuity, so the Court deems that argument conceded. *See, e.g.*, *Dawn J. Bennett Holding, LLC v. FedEx TechConnect, Inc.*, 217 F. Supp. 3d 79, 82 (D.D.C. 2016) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, the court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 2017 WL 2373115 (D.C. Cir. Apr. 4, 2017). As to closed-ended continuity, Mesfin claims he has alleged "thousands of unlawful predicate acts." (Opp'n at 9.) The Court disagrees.

In assessing closed-ended continuity, the caselaw points to six relevant factors: "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Adler*, 496 F. Supp. 3d at 279 (citing *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995)). These factors are not "rigid," but instead serve as a "flexible guide." *W. Assocs.*, 235 F.3d at 634. In *Adler*, the court applied these factors and held that a complaint's allegations failed to plausibly show closed-ended continuity where the conduct turned on a "single scheme" involving "twelve predicate acts" occurring mostly "over a four-month period" against a handful of alleged victims (two to nine). *Adler*, 496 F. Supp. 3d at 280–81 ("Plaintiffs have alleged a single scheme or twelve predicate acts over a few months—two years at the most[.]"). This same logic extends to Mesfin's allegations. Taken as true, the Amended

---

[4] Gebrehiwot also argues that Mesfin does not allege the underlying fraud giving rise to his RICO theory with sufficient particularity. (Mot. at 4–5.) That argument fails for the same reasons explained already.

Complaint's allegations plausibly demonstrate a single alleged scheme involving eight predicate acts over a period of several weeks (*see* Am. Compl. ¶ 12) against a single alleged victim. These allegations come up short. *See Adler*, 496 F. Supp. 3d at 280–81; *see also Bridges*, 842 F. Supp. 2d at 265–67 (rejecting sufficient continuity where the allegations implicated "a single scheme with a single injury to a single specified victim" playing out "over a mere five months."). If anything, the claim here appears to be something close to a paradigmatic example of the type of case that warrants judicial "caution" to guard against "ordinary commercial fraud from being transformed into a federal RICO claim." *W. Assocs.*, 235 F.3d at 637.

Mesfin seeks to avoid this result by pointing to the fact that Et Raiye's website "states that they have 'sent over thousands [of] safe transfers'" and that Gebrehiwot has allegedly "admitted individually to having exchanged Birr for approximately five hundred individuals in about three thousand transactions." (Opp'n at 9 (citing Am. Compl. ¶¶ 7).) But even accepting those allegations as true, they simply reflect that Gebrehiwot and Et Raiye have worked with other money-exchange customers in the past, not necessarily that there were thousands of unlawful acts that were akin to the alleged fraud that befell Mesfin through his latter group of failed transactions. After all, Mesfin himself alleges that Gebrehiwot and Et Raiye completed several transactions on his behalf "without incident or delay," resulting in the successful exchange of currency valued at nearly $60,000 U.S. dollars. (Am. Compl. ¶ 11.) The Court cannot plausibly assume that every prior transaction carried out by Gebrehiwot and Et Raiye was unlawful in the same way Mesfin alleges, at least not based on the allegations pled here. In fact, Mesfin does not even squarely allege as much, let alone with reference to even one other specific victim.

Plus, because the gravamen of the underlying RICO conduct alleged here is fraud-based (*see* Am. Compl. ¶ 32), Mesfin must plead this claim with particularity under Rule 9(b). *Brink v.*

*Cont'l Ins. Co.*, 787 F.3d 1120, 1127 (D.C. Cir. 2015).[5] As explained above, Mesfin met that burden for purposes of the fraud-related allegations tied to him specifically. But the Amended Complaint's generalized allegations that Gebrehiwot and Et Raiye may have committed similar wrongdoing in connection with other unidentified potential customers through other unidentified potential transactions falls far short of satisfying Mesfin's pleading burden under Rule 9(b). Thus, Mesfin's reliance on those allegations is separately unavailing on this additional basis, too.

In sum, the Court concludes that Mesfin fails to plausibly allege a RICO claim, so it will grant Gebrehiwot's motion to dismiss Count IV against him.[6]

### IV. Violation of the Maryland Consumer Protection Act (Count V)

Through Count V, Mesfin alleges that Gebrehiwot and Et Raiye both violated the MCPA. (*See* Am. Compl. ¶¶ 40–44.) The MCPA prohibits a variety of "unfair, abusive, or deceptive trade practice[s]" in "consumer services" and other business arenas, and it authorizes a private cause of action to recover damages. MD. CODE ANN., COM. LAW §§ 13-303, § 13-408(a).

Gebrehiwot seeks dismissal of this claim on single, narrow basis. He says the challenged services—here, "intercontinental money transfers"—are not encompassed by the statute's definition of "service." (Mot. at 7.) Section 13-101 defines "service" to include any "(1) [b]uilding repair or improvement service; (2) [s]ubprofessional service; (3) [r]epair of a motor vehicle, home

---

[5] Specifically, the Amended Complaint alleges that Gebrehiwot, Et Raiye, and others: "formed an enterprise and a scheme to defraud. This fraud involves fraudulently inducing victims to use Et Raiye to deposit money into foreign financial accounts with the promise of exchanging that money into U.S. Dollars with the intention of not making the promised exchange." (Am. Compl. ¶ 32.)

[6] The Amended Complaint seems to invoke an alternative RICO theory tied to the church with which Gebrehiwot is affiliated. Mesfin alleges that Gebrehiwot offered to provide him with false receipts for charitable donations to the church "in exchange for a portion of the tax savings"—an alleged scheme that Mesfin characterizes as tax fraud and supposedly shows that Gebrehiwot is using the church "as part of the enterprise" implicated by the RICO claim. (Am. Compl. ¶¶ 34, 36.) This theory is murky, to say the least. In any case, Mesfin never mentions it in his opposition brief, so the Court declines to consider it further.

appliance, or other similar commodity; or (4) [r]epair, installation, or other servicing of any plumbing, heating, electrical, or mechanical device." MD. CODE ANN., COM. LAW § 13-101(j). In response, Mesfin says the services here fall within the ambit of "subprofessional service," a term the Court should construe broadly. (Opp'n at 10–11.) The Court agrees with Mesfin.

For starters, the Maryland legislature specified that the MCPA "shall be construed and applied liberally to promote its purpose," to include preventing "unlawful consumer practices" from occurring in a wide range of service industries across the State of Maryland. *See* MD. CODE ANN., COM. LAW §§ 13-102(a)(1) & (b)(3), 13-105. This interpretative lens cuts against Gebrehiwot's dismissal argument out of the gate. More, as Mesfin points out, the statute enumerates several express exemptions from coverage, and money transmittal services is not among them. (Opp'n at 11 (citing § 13-104).) Maryland courts "narrowly construe exemptions where the [legislature] has created remedies that are not found in common law." *Andrews & Lawrence Pro. Servs., LLC v. Mills*, 223 A.3d 947, 965 (Md. 2020). Framed in this way, and especially since Gebrehiwot fails to advance any supporting caselaw or other authority for his argument, the Court is not prepared at this juncture to dismiss the MCPA claim based on an argument that the money transmittal services at issue fall categorically outside the statute's reach.

V. **Negligence (Count VII)**

Through Count VII, Mesfin alleges—seemingly in the alternative to his fraud-based theories—that Gebrehiwot and Et Raiye are liable under a theory of negligence, including because they "used unauthorized delegates" in Ethiopia to receive his money transfers who they allegedly "did not investigate" to confirm whether they "could be trusted." (Am. Compl. ¶¶ 49–55.)

Under Maryland law, negligence is familiarly pled by showing duty, breach, causation, and injury. *Rowhouses, Inc. v. Smith*, 133 A.3d 1054, 1066 (Md. 2016). Here, Gebrehiwot argues for

16

dismissal of Mesfin's negligence claim solely on the basis that he did not plead a predicate duty. *See Walton v. Premier Soccer Club, Inc.*, 334 A.3d 784, 792 (Md. 2025) ("Negligence is a breach of a duty owed to one, and absent that duty, there can be no negligence."). The predicate duty in this context is often referred to as a "tort duty." *Id.* (quoting *Jacques v. First Nat'l Bank of Maryland*, 515 A.2d 756, 760 (Md. 1986)). "Tort duties are imposed by law as a matter of sound policy." *Id.* "Generally, when the potential harm is economic, no tort duty will exist without 'contractual privity or its equivalent' between the parties." *Id.* (quoting *Jacques*, 515 A.2d at 760).

Gebrehiwot's argument focuses on Mesfin's invocation of the MMTA to allege that Et Raiye was required to hold Mesfin's money "in trust" during the exchange transactions. (Am. Compl. ¶ 50.) According to Gebrehiwot, Mesfin's reliance on the MMTA fails because it supposedly does not provide for a private cause of action and "does not create any fiduciary duty." (Mot. at 7–8.) But Mesfin does not invoke the MMTA as the cause of action itself. The cause of action is a common-law negligence claim, and the MMTA simply serves as a springboard for one of Mesfin's arguments as to why Gebrehiwot and Et Raiye owed him a predicate duty in carrying out the transactions they promised to facilitate on his behalf. In any case, Mesfin plausibly pled contractual privity with Gebrehiwot and Et Raiye. (Am. Compl. ¶¶ 17–22.) And taking those allegations as true, that contractual privity led Mesfin to entrust hundreds of thousands of dollars to Gebrehiwot (representing Et Raiye) to exercise care to ensure that the exchanged funds were provided back to Mesfin as agreed. On these allegations, the Court is not prepared—at this early juncture in the case—to dismiss Mesfin's negligence claim on this basis.

## VI.     Unjust Enrichment (Count VIII)

Through Count VIII, Mesfin asserts a claim of unjust enrichment against Gebrehiwot and Et Raiye, in the alternative to his breach-of-contract theories. (Am. Compl. ¶¶ 56–58.)

Under Maryland law, the elements for unjust enrichment are (1) "a benefit conferred upon the defendant by the plaintiff," (2) "an appreciation or knowledge by the defendant of the benefit," and (3) "the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000) (cleaned up). Here, Gebrehiwot seeks dismissal of this claim on the basis that Mesfin's alleged transfer of the funds to others in Ethiopia necessarily defeats any finding that Gebrehiwot or Et Raiye—as opposed to the direct recipients in Ethiopia—reaped any resulting benefit. (Mot. at 9–10.) But that argument rests on an unduly cramped reading of the Amended Complaint. After all, Mesfin alleges that Gebrehiwot (representing Et Raiye) directly confirmed to Mesfin that he controlled the accounts where he was directing Mesfin to transfer his funds. (Am. Compl. ¶ 9 ("When Mr. Mesfin asked Mr. Gebrehiwot whether Mr. Gebrehiwot controlled the accounts to which the funds were sent, Mr. Gebrehiwot responded in the affirmative.").) Thus, even if the accounts were beneficially in the names of others, the Amended Complaint plausibly shows how Gebrehiwot (and Et Raiye) controlled the accounts and were thereby allegedly unjustly enriched by the challenged acts.

### VII. Conversion (Count IX)

Through Count IX, Mesfin asserts a claim for conversion against Gebrehiwot and Et Raiye. (Am. Compl. ¶¶ 59–63.) "Conversion is an intentional tort, consisting of two elements, [1] a physical act combined with [2] a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004). The "physical act" must be an "act of ownership," which "can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.* The requisite intent is "an intent to exert control over the property" contrary to a plaintiff's ownership interest. *Id.* at 836. "At minimum, a defendant liable of conversion must

18

have 'an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* (citation and quotations omitted).

Gebrehiwot's challenge to this claim focuses on Mesfin's citation to Maryland regulations concerning money transmittal. (*See* Am. Compl. ¶ 60 (citing MD. CODE REGS. 09.03.14.13).) Mesfin's theory, based on the allegations of the Amended Complaint, is that the regulations impose duties on Gebrehiwot's "authorized delegates" in Ethiopia—the holders of the accounts where Mesfin was directed to transfer his funds—that flow up to Gebrehiwot. Gebrehiwot says that the regulations cannot support a conversion claim and do not authorize a private right of action. (Mot. at 8–9.) But as above, Mesfin's argument survives a motion to dismiss on a more straightforward basis: Gebrehiwot's alleged assurance to Mesfin that Gebrehiwot (representing Et Raiye) exercised control over the accounts where he directed Mesfin to send funds. (Am. Compl. ¶ 9.) That fact-based allegation plausibly shows that Mesfin exercised—and allegedly continues to exercise—control over Mesfin's funds through the Ethiopian accounts. Whether and to what extent those allegations bear out with evidence over the course of discovery may be a different question. But those allegations are sufficient to support a viable conversion claim at this early juncture.

## CONCLUSION

For the above reasons, this Court **GRANTS** Gebrehiwot's motion to dismiss in part and **DISMISSES** Mesfin's RICO claim in Count IV of the Amended Complaint. The Court otherwise **DENIES** the motion to dismiss. The Court will issue a separate order so stating.

Dated: October 8, 2025

                                                           MATTHEW J. SHARBAUGH
                                                           United States Magistrate Judge